IN THE UNITED STATES DISTRICT COURT

                     FOR THE DISTRICT OF OREGON

JASON OWENS,                      )
                                  )
             Plaintiff,           )   Civil No. 08-6237-HO
                                  )
                                  )
         v.                       )   ORDER
                                  )
LUMBER PRODUCTS, an Oregon        )
corporation,                      )
                                  )
             Defendant.           )
_____)

    Plaintiff, Jason Owens, brings this action against his employer, Lumber Products, pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq., alleging Lumber Products failed to accommodate his narcolepsy and fired him because of it.

    Lumber Products is a wholesale distributor of building materials with a distribution warehouse in Eugene, Oregon. Essential functions of the job of a warehouse worker at the Eugene warehouse include operation of a forklift. About 90% of a warehouse worker's time is

spent operating a forklift. The workers must have a current forklift operator's license, undergo safety training, and complete a safety quiz. Forklift accidents can cause expensive damage and serious injury, including death.

Owens began working at Lumber Products on May 3, 2005, as a forklift operator at the Eugene warehouse. During the week of March 27, 2006, Owens fell asleep twice while operating his forklift. On April 5, 2006, Owens again fell asleep while operating a forklift. Owens supervisor, Keith Lambright, reprimanded Owens for these incidents and suggested that Owens see a doctor. On April 11, 2006, Owens again fell asleep for which he was again reprimanded.

On April 17, 2006, Owens saw a sleep specialist who eventually diagnosed Owens with narcolepsy. Owens doctor prescribed Provigil and Owens informed Lambright of the diagnosis and treatment on May 18, 2006.

On July 6, 2006, Owens doctor informed Lambright that

> Provigil is a novel alertness-promoting agent used for narcolepsy, shift workers and people with excessive daytime somnolence. [Owens] denies any side effects and is more awake and alert during the daytime. We discussed driving issues and the patient denies any major drowsiness since starting treatment with Provigil.

Ex. 1 attached to Declaration of Keith Lambright (#14).

On October 23, 2006, Owens' Doctor informed Lambright that Owens

> suffers from severe residual somnolence despite taking Provigil ... and recently he failed Ritalin. He finds himself extremely sleepy and tired after 9:00 pm. [Owens] often has to stop operating the forklift to take Provigil

>   and walk around for 5-10 minutes until the medication
>   begins to take effect....
>
>   [Owens] had a chance to work during the daytime and he
>   noticed immediate improvement. There was no evidence of
>   any significant daytime somnolence while working the day
>   shift and taking just one pill of Provigil, As you know,
>   Provigil is a safe stimulant agent used for shift work,
>   narcolepsy and sleep apnea patients.

Ex. 2 attached to Declaration of Keith Lambright (#14).

Lumber Products permitted Owens to stop work whenever he felt sleepy, take Provigil, and walk around for 5-10 minutes until it took effect.

On December 18, 2006, Owens' doctor prescribed Adderall to be taken by Owens in addition to the Provigil. Owens informed Lambright of the additional medication and Lambright asked Owens to provide a release from his doctor stating it was safe for Owens to operate a forklift while taking the Adderall. On December 20, 2006, Owens doctor responded that:

>   Jason Owens ... has severe narcolepsy exacerbated by shift
>   work. He failed Provigil because of daytime sleepiness
>   while at home. Since he started Adderall ... and Provigil
>   ... he denies any drowsiness while at work. The patient
>   operates a forklift and denies falling asleep while at
>   work.
>
>   In October 2006, I recommended switching [Owens] from shift
>   work to a daytime job. The daytime job improved his
>   daytime alertness and he required less stimulant
>   medications while operating heavy machinery during this
>   short period of time.
>
>   Adderall is a traditional stimulant containing
>   dextroamphetamine /see instructions/. The patient denies
>   any side effects such as cardiac palpitation, tachycardia,
>   tremor, sweating, headaches. At this point, I would

>	recommend continuing Adderall and Provigil in order to remain awake and alert during his working hours.
>
>	Again, I would highly recommend switching his shift work to a daytime job in order to avoid high doses of stimulants and improve daytime alertness. I plan to see him in three months.

Ex. 3 attached to Declaration of Keith Lambright (#14).

The December 20, 2006 Letter from Owens' doctor also contained instructions in which it is noted that Adderall "may impair the ability of the patient to engage in potentially hazardous activities such as operating machinery or vehicles; the patient should therefore be cautioned accordingly." Ex. 4 attached to Declaration of Keith Lambright (#14). Lambright concluded that the letter was not a release for Owens to safely operate a forklift.

Owens told Lambright that his doctor refused to provide a release

>	[b]ecause of the generalized warning on stimulants, he couldn't give a release saying, you know, "you can go out and drive a forklift, you know, wherever." He said, "I wouldn't be able to give them one for Provigil either, but they never asked for one."[1]

Deposition of Jason C. Owens at p. 100 (attached as Ex. 1 to Declaration of Ryan Gibson (#31)). Lambright suspended Owens until he could get a written release allowing him to operate a forklift while taking Adderall.

---

[1] Owens stated that he did not specifically share with Lambert that his doctor would not give him a release for Provigil, but only mentioned what his doctor had said about the generalized warning on stimulants. Owens Deposition at p. 105 (attached to Westlind Declaration (#13) as Ex. 1 at p. 20)).

On December 23, 2006, Owens proposed that he be given a position as an entry level salesman and also noted that Lumber Products

> has been compassionate in this situation where any other would have called me an insurance risk and let me go back in May, and for that I am truly grateful....

Ex 1 to Declaration of Dennis Westlind (#13) at p. 47 and p. 48.

There were no vacant sales positions available. Lumber Products also determined Owens was not qualified for a sales job and that several other warehouse workers with more experience, seniority and product knowledge also were interested in sales if a vacancy opened. Lumber Products also determined that there were no other vacant positions to which Owens could be reassigned.  On December 27, 2006, Lumber Products informed Owens that, because of the risk of having him continue as a forklift operator and because no other positions were available, his employment was terminated.

Lumber Products seeks summary judgment contending that Owens disability claim fails as a matter of law.  Because Owens must demonstrate disability to succeed on his claim and because Owens concedes that the United States Supreme Court decision in <u>Sutton v. United Airlines</u>, 527 U.S. 471 (1999) is controlling, Owens' claims must fail and summary judgment should be granted in favor of defendant Lumber Products.[2]  The parties agree that the ADA Amendments

---

[2]The court need not reach the issue of whether Owens was qualified for the his job or whether his condition could be reasonably accommodated.

5 - ORDER

Act of 2008, which limited the scope of Sutton, does not apply retroactively to this case.

Owens alleges that Lumber Products violated the ADA in that it "refused and failed to reasonably accommodate Owens' disability, and discharged him from his employment as a result of his disability. To prove his claim Owens must establish

> (1) that he is a disabled person within the meaning of the ADA; [footnote omitted] (2)that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability.

Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996).

For purposes of this case, a disability is defined as (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment. Sutton 527 U.S. at 478. Whether a person has a disability is an individualized inquiry. Id. at 483. This inquiry requires consideration of the effects of corrective measures when judging whether a person is substantially limited in a major life activity. Id. at 482-83.

Owens concedes that Provigil and Adderall taken in combination is completely effective in resolving his symptoms of narcolepsy. Owens Deposition at p. 74-75 (attached to Declaration of Ryan Gibson (#31)). Owens claims limitations regarding his condition when he does not use medications, but there is no dispute that his condition causes no limitations when treated by medication.

Owens argues that the problem with the conclusion that he is not disabled because of mitigating measures is that Lumber Products would not permit him to take all of his medications and still operate a forklift. Therefore, Owens contends, he is disabled in the major life activity of working and that Lumber Products refused his requested accommodation of taking medications. While this argument appears to have merit at first glance, it requires a finding that exclusion from one job constitutes a substantial limitation.

The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. 29 C.F.R. § 1630.2(j)(3)(I). Owens also implies that perhaps he could have performed his work without Adderall if he were allowed to work the day shift instead of the swing shift. However, in addition to the fact that the day shift was not available to Owens because of seniority issues, the inability to work a particular shift does not constitute substantial limitation of the major life activity of working. See Sutton, 527 U.S. at 492 ("[I]f a host of different types of jobs are available, one is not precluded from a broad range of jobs."). Other courts have reached this conclusion when considering similar situations. See Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 644-45 (2nd Cir. 1998) (holding that police officer who was restricted to a regular schedule of indoor daytime shifts was not substantially limited in the major life activity of working); Kellogg v. Union Pac. R.R. Co., 233 F.3d 1083, 1087-88 (8th

7 - ORDER

Cir. 2000) (affirming summary judgment because employee who could not work more than forty hours per week was not substantially limited in his ability to work); Baulos v. Roadway Express, Inc., 139 F.3d 1147, 1151-53 (7th Cir. 1998) (holding that truck drivers whose sleep disorders precluded them from performing sleeper duty did not possess a substantial limitation on their ability to work and thus were not disabled).

Because Owens' condition was not substantially limiting in its mitigated state, he cannot prevail on his claim under the ADA. Accordingly, defendants motion for summary judgment is granted.

## CONCLUSION

For the reasons stated above, Lumber Products' motion for summary Judgement (#10) is granted and this action is dismissed.

DATED this __5th__ day of May, 2009.

                                  s/ Michael R. Hogan
                                United States District Judge